ÆTNA LIFE INSURANCE COMPANY,
a Connecticut corporation, Plaintiff,

v.

Anna YABLONSKY, Margaret Ann Yablonsky and John Young, Defendants.

No. 16576.

United States District Court
E. D. Michigan, S. D.

Dec. 4, 1957.

Gerald E. Schroeder, Detroit, Mich., for plaintiff.

Joseph M. Rubin and Wm. Cohen, Detroit, for Anna & Margaret Ann Yablonsky.

Cass S. Jaros, Detroit, Mich., for John Young.

LEDERLE, Chief Judge.

### Findings of Fact

1. This action is brought in accordance with the provisions of the Interpleader Statute, 28 U.S.C. § 1335.

2. Plaintiff is a Connecticut insurance corporation authorized to do business in the State of Michigan.

3. On August 1, 1950, plaintiff issued to Chrysler Corporation its group life insurance, Policy No. 40,400 pursuant to which Michael Yablonsky, an employee, received a certificate of insurance, No. 376–03–4505, in the amount of $5,000, effective November 1, 1955. Anna Yablonsky, his wife, and Margaret Yablonsky, his daughter, were named as equal beneficiaries.

4. The policy and the certificate were in full force and effect when Michael Yablonsky died on October 20, 1956.

5. On September 25, 1956, less than one month prior to his death, the insured changed the beneficiary from his wife and daughter to his brother, John Young. All three are the defendants in this case. The only issue is the mental competency of Michael Yablonsky at the date of the change of beneficiary.

6. The testimony is uncontradicted that deceased showed great love and affection for his only child, his daughter, a minor at the time of his death. This affection was returned. All through his last illness she visited him almost daily, feeding and caring for him when necessary. On many occasions, Margaret told her father the news of her forthcoming marriage on September 8, 1956. He refused to discuss it with her. He gave Margaret his blessing but refused to attend the wedding though his daughter and the family priest both begged him to attend. Subsequently, he complained that he had not been invited. Nevertheless it seems that he was fond of his new son-in-law, treating him affectionately both during the years of courtship when he visited the Yablonsky home, and after the marriage. There was no change in the father's attitude of love toward his daughter after her marriage. His only concern about her marriage, often expressed in conversations with his wife, was that he feared Margaret would not finish college. Yet, the money that would have served to help Margaret pay her way through school he gave to John, his brother.

7. Margaret and her mother made all the funeral arrangements, paying for them with their own funds. No help was offered or requested.

8. John Young was 40 years old at the time of Michael's death. He had been employed at the post office for the past 15 years. He occasionally visited the deceased during his stay in the hospital. Once he gave the ill man a sponge bath at home. This was the sum and total of his contribution. He did not offer to assist in the financial arrangements for the funeral. At the time Michael told him in private of the bene-ficiary change, John did not thank him, question it, nor discuss it. His only comment was, "Yes, yes, we will discuss it later." The policy itself changed hands when Michael and John were alone in the hospital room. John testified that deceased was mentally competent.

9. Michael knew he was soon to die. He had made attempts during his last illness to change the beneficiary of two other policies he owned, valuing in total approximately $3,400, from his daughter to his other brother, George, partly to repay George for his kindness during Michael's illness, and partly to provide for the expenses of his funeral. His wife, Anna, refused to surrender the policies, assuring him the change would not be necessary. Yet when the only available policy was changed, it was to benefit John and not George, and no mention was made of the funeral expenses. Furthermore, Michael Yablonsky had always signed formal documents with his full name, "Michael Yablonsky". Only postcards and informal letters had been signed with the nickname "Mike". The change of beneficiary form was signed "Mike Yablonsky".

10. Michael had had his differences with his wife. However, he felt protective toward her and more comfortable in her presence. She nursed him diligently throughout his illness except for a short period of time when, mentally exhausted and fearful of his rages, she left him in the care of her daughter and brother-in-law, George, returning two weeks later, on September 28, 1957, when her husband was readmitted to the hospital.

11. The medical record shows that on February 2, 1956, the first major operation, a colostomy, was performed. The patient was discharged on the 2nd of March, returning for radioactive gold treatments between March 6 and 13th. Discouraged and losing weight, Mr. Yablonsky returned to the hospital for further surgery on the 11th of July. He stayed to the 7th of August, when he was discharged for financial reasons and because the hospital authorities felt he would be more comfortable mentally at

home. He became depressed and was again hospitalized between August 18 and September 1. Between the 10th and 21st of September, he returned to the hospital for cobalt treatments, suffering from nausea as a result. On September 25th, he changed his policy. On the 28th of September, he returned to the hospital, running a high fever, delirious, and disorientated. Claim was made that he had been unable to eat for three or four days and had been running a fever for that period. The hospital placed him in a private room, considering him to be in too confused a state for ward care.

12. Dr. Brennan, head of the Cancer Department at Henry Ford Hospital, and the deceased's attending physician, testified that depression is normal in patients who have had a colostomy performed. They feel unacceptable to society and the ones they love, frequently harboring illusions of infidelity and marital disharmony results. Yablonsky's depression was so marked that a consultation with a psychiatrist was recommended by Dr. Brennan, who thought shock treatments might be of help. This form of therapy was rejected because of Michael's weakened physical condition. On July 16, 1956, Dr. Sly, the psychiatrist, concluded that Michael was suffering from a toxic mania caused by an abscess in the colon. A tranquillizer was recommended. While under the effect of the drug, Michael acted normally. However, the drug lasted only six hours and if he failed to take the dosage, the depressive symptoms would reappear. When feverish, Michael became delirious, losing all contact with time, place, and self-identity. Preventive nursing was recommended, the nurses being warned to watch that he did not harm himself.

13. Michael Yablonsky was ill, depressed, and sometimes delirious. His actions were not normal. He refused to attend his daughter's wedding, insisting he had not been invited, signed a formal document with a nickname, ignored those who had helped him through his illness to favor a man, well able to care for himself, who had done nothing more that administer a sponge bath at one time. He showed protective feelings for his wife and child, he worried about his funeral, he wished his daughter to continue college, yet his act of changing his beneficiary made the fulfillment of these desires less possible. Michael Yablonsky was incompetent at the time he changed his beneficiary.

## Conclusions of Law

1. This is an interpleader action for a sum in excess of $500 brought under 28 U.S.C. § 1335 of which this Court has jurisdiction.

2. "In determining the mental competency of insured to change the beneficiary of an insurance policy, the same rules of law are applicable as in the case of bequests or of deeds, and the test is whether he had sufficient mental capacity to understand the business in which he was engaged, the extent of his property, the manner in which he desired to dispose of it, and who were dependent on him." Grand Lodge, Ancient Order of United Workmen v. Brown, 1910, 160 Mich. 437, 125 N.W. 400; Harris v. Copeland, 1953, 337 Mich. 30, 59 N.W.2d 70; Mutual Life Insurance Co. of New York v. Hughes, 1940, 292 Mich. 644, 291 N.W. 39.

3. Incompetency must be shown by a preponderance of the evidence. Further, the beneficiary alleging incompetency must "establish that the change was not made during a lucid interval." Grand Lodge, Ancient Order of United Workmen v. Brown, 1910, 160 Mich. 437, 125 N.W. 400.

4. Incompetency before and after the date of change of beneficiary may be considered as evidence. Spencer v. Terry's Estate, 1903, 133 Mich. 39, 94 N.W. 372; In re Haslick's Estate, 1917, 195 Mich. 432, 161 N.W. 965; In re Nickel's Estate, 1948, 321 Mich. 519, 32 N.W.2d 733. Testimony of attending physician may be used to show improbability of existence of a lucid moment though the doctor was not present at the crucial time. In re Antila's Estate,

1953, 336 Mich. 189, 57 N.W.2d 492. The fact that a will is contrary to natural justice also may be taken into consideration in determining incompetency. Rivard v. Rivard, 1896, 109 Mich. 98, 66 N.W. 681; Henrich v. Saier, 1900, 124 Mich. 86, 82 N.W. 879; Brereton v. Estate of Glazeby, 1930, 251 Mich. 234, 231 N.W. 566. The insured's physical state must be considered. Mutual Life Insurance Co. of New York v. Hughes, 1940, 292 Mich. 644, 291 N.W. 39.

5. The deceased, Michael Yablonsky, did not have sufficient mental capacity at the time he changed his beneficiary to understand the nature and effect of the act.

6. The change of beneficiary is null and void. Grand Lodge, Ancient Order of United Workmen v. Brown, 160 Mich. 437, 125 N.W. 400; Mutual Life Ins. Co. of New York v. Hughes, 292 Mich. 644, 645, 291 N.W. 39; In re Antila's Estate, 336 Mich. 189, 57 N.W.2d 492.

7. Judgment must be entered in favor of defendants, Anna and Margaret Yablonsky.